SYLVESTER HANDLEY, Appellant, v. SYLVESTER HANDLEY *et al.*

Oral Contract to Sell Land: EVIDENCE FAILS TO ESTABLISH.   Evidence in a suit to quiet title to land examined, and *held* insufficient to establish against his grantor's heirs a certain oral contract set up by plaintiff as the basis of his title, and under which he had entered into possession.

*Appeal from Adair District Court.*—HON. J. H. APPLEGATE, Judge.

THURSDAY, DECEMBER 19, 1901.

ACTION in equity to quiet the title to land.   Decree for the defendants, from which the plaintiff appeals.—*Affirmed.*

*Carr & Parker* and *F. O. Hinkson* for appellant.

*F. H. Gaines (John A. Storey* and *Homer Gaines,* of counsel,) for appellees.

SHERWIN, J.—In 1879 John and Sylvester Handley, two brothers living in Knox county, Ill., were the owners (each of an undivided one-half) of a half section of land situated in Adair county, Iowa.   The plaintiff is a nephew

of these brothers, and in his petition alleges that he took possession of the southwest ¼ of section 21, township 77, range 30 (being one of the quarters of the half section) in 1879, under an oral agreement with John Handley that if he "would occupy and improve the same, keep all taxes paid that might be assessed against the same, and pay to the said John Handley, deceased, during his lifetime, such annual rent as plaintiff might be able to do, then, upon the death of said John Handley, that said described premises, with all the improvements thereon, should become and thereafter be the absolute property of the plaintiff." The plaintiff alleges a performance of this agreement on his part, and, farther, that in 1882, while said John Handley was visiting him at his house on the land, he orally agreed with the plaintiff that, if plaintiff would go ahead and improve and occupy the land, he would, if necessary, buy the interest of his brother Sylvester Handley therein, so as to protect the plaintiff's rights therein, and that the plaintiff should have said real estate upon his death, with all the improvements thereon, as before agreed. That the plaintiff moved on this land in 1879, and that he has since that time lived there continuously, is undisputed. There is a question as to whether he occupied it alone for the first year or two, but we do not deem this of controlling importance. With the exception of the first year or two, he has been in sole possession. One John Mead, another nephew of the Handley brothers, occupied the other quarter of the half section for many years and it is he to whom reference is made in many of the letters which we will hereafter notice. John Handley died in 1899, and this action was brought after his death. The entire record does not disclose a written word from John Handley. The evidence upon which the plaintiff relies is that of witnesses who testify to his oral declarations. The plaintiff's wife testifies that when John Handley made the visit to them in 1882 she heard a conversation between him and the plaintiff as follows: " 'Syl., isn't this a cold, bleak place in the winter

time?' He says, 'Yes, it is.' He says, 'Why didn't you set
out some shade trees before this time?' He says, 'I ought
to have done it, but I haven't had time.' And he says, 'Under
the contract when you came here, this place was to be
yours on my death.' He says, 'You pay the taxes.' My
husband says, 'My uncle Syl. will probably cause me trouble.'
He says, 'If he gives you any trouble, I will buy him out.'
He says, 'Go ahead and put the improvements on the farm,
and you needn't pay any attention to what he writes you.'"
It is somewhat remarkable, as courts often have ocassion to
observe, that witnesses are able to give in detail conversations
which have occurred so many years before. Notwithstand-
ing the fact that the human memory is a wonderful thing,
and that it is often able to recall past events with clearness,
it is generally only in cases of self-interest that it is able to
recall the exact language and mode and manner of expression
used in the given conversation 20 years before. This comes
to the mind with renewed force when the conversation, or
any part thereof, seems to have been untirely unnecessary or
uncalled for, except upon the theory of furnishing evidence
for future use against the declarant. In the conversation
detailed by the witness, it might well have been observed
that the place was bleak and needed trees, and that there
might be trouble with "Uncle Syl.," and the further as-
surance that the plaintiff would be protected if he made im-
provements; but there is no reason apparent why John Hand-
ley should then have called the plaintiff's attention to their
contract of only three years before. If, as claimed, it was
a definite and certain agreement, whereby the plaintiff was
to eventually become the absolute owner of 160 acres of valu-
able land, it certainly was not a transaction of so little
importance as to escape the recollection of either party. C.
W. Neal, one of the plaintiff's witnesses, was a practicing
attorney in Stuart, Iowa, when, in 1891, he was engaged,
through an attorney in Illinois, to assist in an action brought
to evict the plaintiff from the land in question by Sylvester

Handley. He was not personally acquainted with either John or Sylvester Handley, and had never seen either of them until he went to their home, in Illinois, to look after his fee in the cases mentioned. When he arrived there he was introduced to John Handley, who, it will be remembered, was not a party to the suit, and demanded of him pay for his services. John Handley refused to pay him, and in the conversation which followed Mr. Neal says that John Handley told him that his brother Syl. ought not to have commenced suit against the plaintiff. "He says, 'He knows he will own the land,' and spoke about the rent. I said, 'How is it that he was to pay the rent? He owns the farm.' He says, 'It isn't rented. He is to pay whatever he can. I want the boy to get along all right. It is his. But I want to see that he don't get in debt.' He told me that the boy went on the land with the agreement that the land should be his, and that Sylvester Handley knew that to be the fact." Giving the testimony of Mr. Neal its fullest effect, it appears therefrom that John Handley was trying to assist the plaintiff in keeping possession of the land, and that he was perfectly free to talk about his relations with his brother and the plaintiff to an entire stranger, and that he had entered into the agreement in 1879 as claimed. We notice in passing the statement of John Handley that his brother Sylvester knew of his agreement with the plaintiff, and also that after John Handley's death Mr. Neal, as the attorney for one of the heirs, Patrick Handley, began an action of partition for him, involving this same land. Another witness for the plaintiff, Mr. M. J. Dougherty, an attorney of Galesburg, Ill., testifies as follows regarding a conversation with John Handley in the fall of 1891 or spring of 1892, and later in March, 1893. "My impression is that old Syl. and he were quarreling over that matter, and old John using his best endeavors to keep them from putting young Syl. off. Q. He said the land is his, or something to that effect, or he has a right to use it? A. He expressed it in such a singular

way.  He would sit on the side of the bed, his elbows this
way (indicating) on his knees, his head down, and he would
hardly look up until I would almost force him to answer.  I
went on telling him he ought to put him off, or make him
pay the rent, or let us do it, or 'If you don't want to do it,
give us the right to put him off or make him pay the rent.'
He says, 'Ain't he there?'  I says, 'Yes.'  He says,
'It is his, ain't it?'  I says, 'How can it be his and
yours?'  He says, 'Don't you know?'—asked me that way.
I told him that he ought to do something.  Sylvester had a
wife and family to take care of, if he didn't.  It was his
privilege to give young Syl. all he wanted to, but not to take
it from his brother.  He says, 'It belongs to young Syl.  Ain't
he got it?  He is there.  It is his.'  Q.  That was when Mr.
Handley was in Galva?  A.  I think that was the third con-
versation.  My impression is that we had a conversation in
the line we have been talking.  The next conversation was in
Galva, when this agreement was drawn up dividing the land.
We talked the matter over, ordering the bill dismissed, I
think.  My impression is that the next March succeeding
August 3, 1892, he was to pay for the land.  After that
was over, we went out.  Just as we stepped out,
we talked about the matter.  I know that the old
gentlemen said, 'Now, you will let him alone.  It is his.'
And some time after he got everything signed up, old
Syl. says, 'When you pay me, it is his, or whatever you please
to do with it.'  We talked some more, and he told Syl.
he bought it to give that boy his peace, and to keep Syl.
from interfering with it."  This testimony is not as strong
and definite as that given by the witness Neal, but tends in
some degree to show that an agreement of some kind had
been made whereby the plaintiff had acquired an interest in
the land though such expressions as: "It belongs to young
Syl.  Ain't he got it?  He is there.  It is his."  "Now, you
will let him alone.  It is his,"—are quite indefinite and un-
certain, and do not furnish strong support for plaintiff's con-

tention. There is the testimony of other witnesses along this same line, but it is not, in our judgment, of such character as to merit or require special mention, farther than that it is to some extent corroborative of the plaintiff's claim.

There is evidence before us of declarations of the plaintiff that are entirely inconsistent with his claim of ownership of the land. But the strongest and most convincing, and, we may say, almost conclusive, proof that no such contract was ever made as he claims, is to be found in a series of letters written by him to John and Sylvester Handley, and to John Handley after he acquired his brother's interest in the land in question, covering the entire time after he went into possession thereof until his Uncle John's death. The profession would derive no benefit from extended quotations from these letters, and the limits of this opinion will not permit us to indulge therein. We will make, however, brief quotations from the most imporant ones, for the purpose of showing their general tenor. As early as August 17, 1879,—the same year that the plaintiff claims he went into possession under his contract,—he wrote a letter signed by "John Mead and Sill Handley," addressed to both uncles in Illinois, in which he says: "Well, boys, in regard to renting your farm another year, with the privilege of five years;" "Well, boys, we will tell you our terms. We are willing to give you $350 dollars for both quarters, payable the first of every June." "Well, boys, the reason we want to rent the place for five years is, we want to break up all the sloughs, and we don't feel like doing it on the term of one year, as there is too much work about it; and we will build a small pasture fence at our own expense, if our terms suit you; if not, we will try and do better." February 3, 1880, he wrote complaining because an order had been sent to one Hubbard to collect for corn sold by him, and says: "Well, now, Sill, as for my money there I owe you, I will send you $75 if you send me my notes." "I have bought $25 worth of lumber, and that is all the place is worth. That is what I work at it

That will make you $445.00 for this year, and that is better than you got off the place in ten years before." October 1, 1882, he writes: "Well, boys, we will continue to work the farm another year." "Well, boys, money is the next thing you want. You may look for it when it is due, crops or no crops." March 11, 1886, he writes: "I thought I would write you a few lines in regard to rent. Sorry to inform you that we have not got a dollar left to give you. * * * We want you to take a mortgage on a hundred and forty acres of corn to be planted on both places, for the sum of $400.00, to be paid the first of March, 1887, for this year's rent." August 1, 1886, he writes: "It is the time of year for us to know what to do. * * * We will meet our rent this year at the time mentioned. * * * What we want is the place for the term of five years, so we can go ahead and build our hog pasture, as there ain't any money in feeding hogs in a dry pen. * * * If you don't want to accept these terms, we will take it on yearly terms, by you building the pastures. * * * We want to hear from you at once, as this is the time of year land is rented out here, so we will know what to do in regard to fall work." September 12, 1886, the plaintiff wrote to his uncles again about renting the land, and says: "We received your note yesterday, and in reply will say that you will have to say what you will do, or what you won't do. * * * Say whether we can have the place for another year or not. * * * We don't propose to do any work on the place until we get this thing settled. * * * We do not propose to be hounded around any longer by outside parties, as we are the men that has to pay the rent. * * * We can rent all the good improved land we want around here before the sun goes down, without improving it ourselves." These excerpts from letters written to both brothers, as a general rule, are a fair sample of a larger number which we have not specifically noticed. Early in 1893 John Handley bought

his brother's interest in the land in question, and the plaintiff thereafter addressed his communications to him, so far as the record shows, and they are of the same general tenor as those to which we have already referred. The plaintiff seeks to explain these letters by saying that they were written for the purpose of "bluffing" his uncle Sylvester, and to protect himself against the payment of an excessive amount of rent each year; and his counsel argue that the letters are not really inconsistent with the terms of his contract, and that they were so written, in part, to keep from Sylvester Handley knowledge of the agreement with John. So far as the latter point is of consequence, it is disposed of by the evidence that Sylvester knew all about it. It may be admitted that this correspondence does not establish any specific rental for each year, and in this respect is not necessarily antagonistic to the contract; but no one would write letters of the general tenor of these as to terms and length of occupancy, improvements, etc., who was in possession of land under a contract of sale or gift. The evidence shows that John Handley could neither read nor write, and the language of the letters from the plaintiff to the brothers is generally directed to Sylvester during all of the time in question, and particularly when the plaintiff was writing on the hard times, and of his inability to pay rent as he had agreed; many letters relating thereto showing an agreed sum therefor. No word is said about the contract, nor is any language used from which a just inference can be drawn that it was even referred to in the most indirect way. The law is well settled as to the proof required to establish contracts of this kind, and we are firmly convinced that no contract is proven in this case.

The judgment of the district court is AFFIRMED.